By the time this case was tried in the summer of 2017, judges from the Eastern District, Western District, Northern District, and Southern District of Texas all, in various rulings, made an eerie guess that Texas would ultimately adopt a cause of action for aiding and abetting breaches of fiduciary duty and the commissions of other torts. There were, at the time of the trial of this case, no fewer than 20 or more opinions from district courts in Texas on that point. Then, on April 25, 2018, a month or so after the appeal was filed in this case, this court in the Dupuy Orthopedics case said to the contrary. The court there said, no, that a court cannot make an eerie guess of this type. And less than until the Texas Supreme Court speaks on this issue, which it has not, in Texas, there is no such cause of action, referencing a cause of action. Okay, so you all made the judge change it from knowingly participate, which we can't overrule the Texas Supreme Court and is clearly actionable. And now you want to go, ha, ha, ha, ain't no aiding and abetting. You think that works? I mean, I find this to be, frankly, a shocking argument that you asked for this language, and now you're trying to use it against them. I respectfully disagree, Your Honor. The reason for changing it from knowingly participate to aiding and abetting is because knowingly participate springs from the Kinzbach case. And the Kinzbach case, by definition, had no application on these facts because Kinzbach, as later recognized in Parker, is specifically limited to the context of equitable forfeiture in a case where there is no need to prove proximate causation. Kinzbach, by definition, does not apply to damages. But knowingly participate in a fraud is actionable. Aiding and abetting, we've said, well, knowingly participating in a fraud is actionable. We've said aiding and abetting a strict liability, negligence, products liability case is not. That's where we're at. And you all changed the language to get there. I mean, the knowingly participate is Texas law. And it's parameters we can debate, but it is Texas law. It is Texas law in an equitable forfeiture case, which this was not, which is why we said to Judge O'Connor, if they want to do this secondary liability concert of action kind of theory, it should not be phrased in terms of knowing participation because that's a claim that is limited to equitable fee forfeiture. So to the extent there is going to be this concert of action theory, it would have to be under 876 of the restatement, which is aiding and abetting. Also, I certainly understand the dilemma, if that's the right word, maybe not, that you were in. But nonetheless, you did give O'Connor this choice as opposed to saying for the various reasons you just explained to Judge Haynes, what's in the jury instructions doesn't work and nothing else does work. But that wasn't maybe a secondary argument. I don't recall now. But once you bought into and did not object to aiding and abetting, we're in that world of waiver. Well, respectfully, Judge Southwick, I think we're not because at the time that this case was tried, the law in the district courts of Texas, including the northern district, was that such a cause of action exists. That was the landscape. That landscape was changed when the Dupuy case came down. And we've cited – Explain to me how a case that has nothing to do with fraud and participation in a fiduciary duty, nothing whatsoever, can change – a Fifth Circuit case can change Texas law. The case did not change Texas law. What the case said was that prior decisions in district courts that said that Texas law recognizes a common law cause of action for aiding and abetting is wrong and that a district court or a court of appeals, for that matter, cannot make that kind of an eerie guess. And so given that you cannot make that kind of an eerie guess because it's, in effect, not filling in the elements of a cause of action, it's creating a cause of action that the Texas Supreme Court has not yet created. Because you cannot make that kind of an eerie guess for cases in Texas, aiding and abetting does not exist. And we've cited the Carroll case and the employers – Okay, but Dupuy specifically accepted Kinsbach from its discussion and was not dealing – and unless I'm missing something from that case – they were not dealing with knowing participation in a breach of fiduciary duty, which is what we have here, or at least what we have alleged here. So assume arguendo that Mr. DeGioia knowingly participated in a breach of fiduciary duty. Your argument is that's not actionable because they're seeking damages. I don't necessarily agree with that. But that is a separate thing from whether you can aid and abet a violation of products liability laws. It's just a very different case. And again, I'm struggling with the idea. Even if we assume that Dupuy overruled a bunch of district court cases that people might have been relying on, for the principle of the intervening case law that changes the law, that principle, I don't see how a Fifth Circuit case can be that intervening change in the law when we're talking about a state law question. And it's not directly on point, those two things. I don't see how that – Invited error. Those three things. Again, given the legal landscape under which we tried this case, which was it was essentially established in the northern district of Texas where we tried the case, and frankly in every other district in Texas, that under an eerie guess this cause of action would exist, then we tried the case on that basis. I wouldn't make that mistake again. I understand, Your Honor. But under the Carroll case, the employer's insurance case, there is no waiver issue. If you agree with my premise that Dupuy – It's not waiver. It's invited error. And again, I don't know how to say it any differently, so I may move on to another point because I have limited time. With respect to the Kinsback issue – I want to ask you a question. Yes, Your Honor. Mr. DeGioia wanted to be an advisory director, but yet you stipulated in the jury charge that he was a director. So, you know, it's one thing to be an advisory director. It's another to be a director, and frankly I was surprised to see a stipulation that he's a director. For purposes of the argument, we don't dispute that he had, during the limited time that he was on the board, from October, I think it was, of 2011 until September of 2012, he was treated – in his mind, he was an advisory director. That's what his documentation said. But he was also listed in the minutes and in the public disclosures as a director. So I'm not disputing that for that period of time he had a fiduciary duty. We pointed out that it was an advisory director because that's what the documents actually say. But I'm not arguing that for that point of time he did not have a fiduciary duty. Now, I'm arguing certainly that there's no evidence that he breached it or no evidence of any proximate cause of damages from that breach, which brings me back to Kinsback. The whole point of Kinsback here is it's being limited to equitable forfeiture cases where there is, by definition, no requirement that there be a proximate cause finding, as to any defendant, even the primary violator. In that kind of a case, as the Texas Supreme Court said in Parker, there is no requirement for proximate cause as to anybody. Okay, but that's different from whether you can have liability for knowing participation, whether you also have to prove proximate cause to get damages. Those are two separate questions. No, understood. It's like I can show that you failed to yield when you should have. I still have to show that caused my car to be damaged or me to get a heart attack or whatever. Okay, those are two separate questions. I agree with you, and I had moved on to my next argument, which is specifically focused on the proximate cause piece. And under Parker, because this is not a Kinsback case, by definition it's not a Kinsback case because there were no equitable remedies sought, under Parker the only way de jure can be jointly and severally liable or liable at all, whether for his direct breaches or for only participating or aiding somebody else's breaches, is if there is a proximate cause finding. So are you abandoning your standing argument? I'm not. I just, given the amount of time I have, I haven't had a chance to get to it. But with respect to proximate cause, under Parker there has to be a proximate cause finding. It's just like in conspiracy. Texas generally, on concert of action theories, whether it's conspiracy or whether it's aiding and abetting, getting the initial finding that you were in a conspiracy or that you aided and abetted does not as a matter of law make you jointly and severally liable for all of the damages caused by the conspiracy or all of the damages caused by the primary violator's breach of fiduciary duty. As to conspiracy, we've cited the THPD case and this court's case decision in Homiki. As to aiding and abetting and breach of fiduciary duty, it's Parker. Parker says you have to have a finding of proximate cause, and here there is no finding of proximate cause. Thank you. Thank you, counsel. I know you had more to cover, but we'll have you brief. Good morning. May it please the Court. Ken Schuman on behalf of Matt Cohn, Howard Appell, and Ernest Barker. I'd like to pick up on damage element number one, which does specifically relate to the issue that Mr. Farrell was discussing regarding Parker. The one thing that Parker tells us is the Texas Supreme Court case 2017. The Texas Supreme Court said that we're not recognizing a cause of action for aiding and abetting, but it then went through the elements of what an aiding and abetting claim would be under Texas law if it was recognized. Primary violation of law, knowledge, substantial assistance, and as Mr. Farrell said, the Texas Supreme Court specifically said that there had to be proximate cause between the substantial assistance and the harm or the damages in that case. With respect to damage element number one, the jury found no liability for aiding and abetting for Howard Appell and Ernest Barker. So the issue then becomes whether or not they can be jointly and severally liable for the $6.5 million that was awarded against Matt Cohn. Well, the answer is no, they cannot be, because there was no finding of proximate cause. Since there was no finding of proximate cause with respect to Appell and Bartlett, with respect to damage element number one, then they cannot be held jointly and severally liable. That's our first argument with respect to damage element number one. With respect to damage element number two, the jury did find damages in the amount of $2.5 million against Howard Appell and $2.5 million against Ernest Bartlett. We contend that there's no evidence in the record that supports the finding of those damages. In opening statement, counsel for Ebert, the plaintiff, acknowledged that Howard Appell and Ernest Bartlett broke even or just about broke even in their trading. In the Rule 50 motion, counsel for Ebert said, Your Honor, this case would be a slam dunk except for the fact that there's no feeling that they really got anything out of it because they just about broke even. Then, finally, Your Honor, the expert witness, Mr. Robert Manns, or the plaintiff, testified repeatedly during direct examination and cross-examination that Appell and Bartlett just about broke even. So your question is, where did the $5 million come from? Mr. Manns prepared an exhibit, and in that exhibit, he had sales of specified defendants in the lawsuit, most of which had been dismissed, and he only counted the sales. He came up to the $5.1 million by only counting sales and not purchases. So it's extremely important that you know and understand that there was no profit because you have to take the sales and you have to subtract the cost basis in the securities. In addition, Your Honors, this was not stock that was issued from LSI. These were open market transactions. So as a matter of law, there is no proximate cause between any profits, if there were any, and any damages to LSI. Beyond that, Your Honors, it's undisputed that Howard Appell . . . Well, the instruction to the jury says the reasonable market value of any gains to that defendant, meaning these four, including salaries, consulting fees, net proceeds from stock issuances to directors and or officers of LSI and other expenses proximately caused by that defendant's breach of judiciary duty. And I suppose the argument can be made that even if these weren't stock sales by LSI, that these two men, Appell and Bartlett, were benefiting from the claimed false statements by LSI causing the stock value to rise, causing them to be able to buy them on the secondary market or whatever and make a profit. They've got to give them back. With all due respect, Your Honor, I think . . . I'm just saying that's what this instruction says. Well, and with all due respect, my reading of the instruction would include the definition of proximate cause. You can't look at damage element number two without the precatory language, proximate cause. Did you object to this instruction? Absolutely not. I love the instruction. Sir? Your Honor, respectfully, I totally agreed with the instruction. I had no objection to the instruction because it contained proximate cause. That's what I was looking for. That's what I received. I knew, first of all, as I've indicated to you, they didn't make any money. And secondly, all those trades were open market trades. Well, weren't there figures of, and I forget, but something like the total stocks sold for $9 million and the total price was $5 million or something? I don't remember the exact figures, but there was evidence presented by this expert. There was evidence presented by the expert. But the expert testified three or four times, Your Honor. They just about broke even. And more importantly, these were not trades by Howard Appel or Ernest Bartlett. These were trades by alleged nominee companies, and this is extremely important. This is the crux of our case, so I hope I can state it sufficiently. These nominee companies, there is no proof in the record that Howard Appel or Ernest Bartlett owned these nominee companies. When asked on cross-examination, can you tie, Mr. Manns, can you tie these alleged nominee companies to Howard Appel, the answer was no. The question was, have you made any effort to? No.  I got it from counsel. Why didn't you try to tie these nominee companies to Howard Appel? Because it would have been too expensive. That's, Your Honor, the status of the record. No effort whatsoever. Then even beyond the fact that we have nominee companies, we have the Pierce and the Corporate Vale. There's no pleading at all in this case that references Pierce and the Corporate Vale. And the only way they could Pierce the Corporate Vale was if they could prove that somehow that these entities were used for fraudulent purposes, and they were not, as I'll get to in a minute. Let me ask you a question that isn't addressed in the briefing. If we do something other than fully affirm or fully reverse, we perhaps affirm in part, reverse in part, so some modicum, let's say, of actual damages remain. Other than the Texas caps on punitive damages, putting that aside, what impact would such a ruling have on the punitive damages? I believe the punitive damages would stand unless the court considered them to be outrageous. But our position is different. So the only limit would be the caps would change because the dollars would change. Your Honor, before my time is up, I've got two minutes left. From the very beginning, the foundation of the plaintiff's case was that Howard Appell engaged in a pump-and-dump scheme. That was a predicate for this entire case. When we get to trial, there no longer is a pump-and-dump scheme. It's an attempted pump-and-dump scheme. And then we had two expert witnesses from the plaintiff, neither of whom proffered an opinion as to whether or not a pump-and-dump scheme even existed. We have not had anything in the record, nothing cited as to one pump or as to one dump in this entire case during the course of the trial and prior to the trial. We knew that we were going to have to prove or offer evidence that there was no pump-and-dump because the jury could disbelieve Howard Appell. So we went out and we hired the best expert witness in the United States of America that we could find, Professor Greg Jarrell, who was the chief economist for the SEC during the Reagan administration, PhD from the University of Chicago. And he took every public statement, even though it was not attributable to Howard Appell. And then he took all the sales and the dates and matched them up and did a comprehensive analysis based on sound economic principles as to whether there was a pump-and-dump scheme. There wasn't a pump-and-dump. There was no attempted pump-and-dump. There's nothing from the plaintiffs that says there's a pump-and-dump. In fact, when Robert Manns, the forensic accountant for the plaintiffs, testified, he testified that he did not do a pump-and-dump. Were you capable of doing one? Yes. Why didn't you do one? Because it was too expensive to do one. Nothing. There's nothing in the record at all that goes to the foundation of this very case. And then, well, my time is up. Thank you, Your Honors. And may it please the Court, Jonathan Franklin for the appellee. The defendants are not entitled to retry their case on appeal, and certainly not on issues that they never raised or preserved below. Okay, but they can raise standing. They can raise constitutional standing, Your Honor. Right. And let's talk about that. Sure. That deal, if, in fact, the trustee could not raise the Jabal claims, you would agree that would eviscerate damage element one. It wouldn't damage element—it wouldn't deal with damage element two, but it would deal with damage element— No, Your Honor. You do not agree. Why not? I want to be clear here. The trustee was bringing claims and was— Okay, okay. No, no, please. Don't do that. If the Jabal transaction amounts, we find she lacks standing to assert. So it's as broad a term as I can use. You're picking at, well, it was really LSI. I mean, I understand. That's a different question. You would agree that eviscerates damage element one. We said no Jabal. I believe—obviously, the jury didn't say exactly where it came from, but it does appear that the $6.4 million was related to the Jabal. And the 1.5. Well, the 1.5 was different, Your Honor. The man's testimony about the 1.5 wasn't tied to the Jabal cable. What else was there? It was the—he went through the debts of the company as a whole during the period in which Mr. DeGioia was a director and concluded that those debts were $2.2 million, and the jury then presumably apportioned a portion of that, probably perhaps by prorating some of the term when he—the months when he wasn't a director. But that was different than the Jabal contract amounts. But let me—can I address the standings? I think it's very important to make this critical distinction here. The trustee was not bringing a claim like a parent's patriarch claim on behalf of the creditor. These amounts— Now, I understand. We have to buy, though, the concept that getting the company into this kind of debt to Jabal is the breach of judiciary duty, right? Yes. That's the Jabal amount. Absolutely. And I think the educator's case makes clear that even if there's an overlap between the claims that could be asserted by a creditor, could be asserted by— What did they end up paying Jabal? I don't know that. They did pay down some— Right. They didn't pay them anything, and they got the equipment, right? They got equipment— They sold the equipment for some amount. Right. But the equipment— Jabal got nothing. The Jabal got some— Did not get the $9.5 million that we've been talking about. Right. That it was owed, yes. That's damage to the company? Yes, because it is, in fact, what caused the company to become insolvent. It was the damage from this scheme was that they engaged in a scheme where they understood, and the jury could reasonably conclude, that they did not have any reasonable prospect that this technology would be commercially successful, yet they continued to make this enormous investment to make a big splash to pump up the value, and that was what— The failure didn't cost Jabal anything because they got discharged, or they got their bankruptcy. I mean, the problem is you're saying this company—not that this company was this thriving, fantastic company until they went off on this side road that was ridiculous, and that brought them down. You're saying the company was just a mess from the start. It had an illusory concept of cleaning water or whatever, and it just kept trying to accomplish that or, in your view, not trying to accomplish it, but doing things that look like they're trying to accomplish it. And so they end up—either way, they end up nonexistent. I mean, the company goes away if it's just not successful. So who is hurt in this? When we stand here at the end of the day and we look at who's hurt, it's Jabal. They're the ones out $9.5 million, not LSI, who was going down in the pit anyway, according to you, which is why you think there shouldn't have been that investment in the Jabal materials. It's obviously the company as a whole, but it's all the creditors. It's not just Jabal. Jabal is not going to get—this money is not going to Jabal, however you pronounce it. It's not going to them. It is going to the bankruptcy estate, and then it will be distributed pro rata to whoever has a claim in accordance with the bankruptcy rules. This is not a situation where the trustee is bringing a claim to recover money for Jabal. It has not happened that way. The cases that they've cited are cases that are like that. They're sort of parents-patriot type cases where you're trying to bring a claim. So they've cited, for example, a claim where a trustee tries to bring a Fair Labor Standards Act claim on behalf of employees to recover their wages that were withheld from them. But wasn't the only evidence, at least as to Cohen on damage element one, the Jabal contract? I think that's obviously, again, the jury didn't say where it came from, but I think that's a fair assessment, Your Honor, but it wasn't a claim on behalf of them. And that also leads to the waiver point, which is very clear from the Norris case, that the argument they are raising now is held in—that was the holding of Norris, that it is not a constitutional standing case. Norris says it is— I remember Norris. I was on the panel. I don't think—I don't remember what it was about. It was they had transferred their claim, but they still had been damaged. So that was the question. So that was a real party and interest analysis. Right. And that's what they're saying here. They're saying here the real party and interest was the Jabal. The Jabal was harmed, and they're the real party and interest, and the trustee can't— But, I mean, you can make any—unless just no one has standing, which sometimes happens with these suits against statutes or something. But you can make any—if you get in a car wreck and I decide to bring a lawsuit, Katharine Haynes sued for the car wreck, you can make that a, well, you're not the real party and interest because you don't represent me and who are you. Or you can make that a standing argument. You weren't injured, Katharine. What did you do in bringing the case? So, I mean, that's the problem. You can make it semantical, but I don't think it is. I understand. But in this case, the company was injured, and that is— that's why they've conceded perhaps that there is Article III standing. The company was— They conceded that? Well, they say in their brief, in their statement of jurisdiction, that the district court had jurisdiction, so there is jurisdiction below. So, in this case, there was Article III standing, Your Honor, because the company— So, the court originally was faced with this massive thing with 40 stuff involved. I mean, it was much bigger. So, the question of whether the trustee has standing to bring this claim is separate from whether the district court had jurisdiction in general— Fair enough. —over this massive mess that was originally brought. Fair enough. This claim, just taking this claim, yes, because this is what caused the company to become insolvent. This debt, the trustees' theory of the case, this debt would never have been incurred, this unpayable debt, the debt that they knew would never be paid, that drove the company into insolvency. The educators' case itself, reaffirmed in the 7Cs case, says that a conspiracy to render a company insolvent, that that belongs, that claim belongs to the trustee. Counsel, let me ask you about this. Part of my problem with your standing is not so much whether there's injury, but where the injury is $9.5 million. Every debt the debtor has is a creditor attached to it, and so to that large percentage of the time, there'll be some independent damages. But all these claims, however, I keep forgetting which pronunciation is right, you would know Jabil's claim, is a precise amount, and there's an awful lot of discussion in the briefing from the trial that it was clear that this $9.5 million was being asserted by the bankruptcy estate, which does sound to me like a 7Cs problem. But Jabil doesn't have a claim against these defendants for breach of a fiduciary duty. So if there was a breach of fiduciary duty, that was a breach owed to or a breach that was caused to the bankrupt estate. But it's not necessarily a $9.5 million claim. But I do see, at least on standing and injury, in fact, that they are injured whether because of their insolvency or otherwise. But I'm not sure they're injured in the amount that they were awarded because that's tied too closely. That's getting us too close to the kinds of problems in educators' trust and 7Cs about whose claim is that claim. Well, I think that you resolved those, I think, frankly, Your Honor, through the analysis that you just went through, and that is that the breach of fiduciary claim that was brought, the breach of fiduciary duty claim that was brought, was a claim that only the company could bring and therefore the trustee. It is not a claim. No way Jabil can sue these three defendants. Exactly. Or defendants, whatever. I would add, Your Honor, that I think pretty much in every bankruptcy case, every claim is going to benefit the creditors. So the fact that the recovery is going to benefit the creditors is not the standing question. That just says that when the trustee recovers what the trustee recovers, it will benefit all of the creditors, not just Jabil, but the employees of the company, all of the others who filed claims. The trustee could have proved more and did not, but the trustee could have proved additional debts that were owed. What do you mean by that? What additional? I mean, conceptually, what are you talking about? I'm saying that the amount of claims against the estate were far greater than just the Jabil claim. So if you added up everything back in the bankruptcy court, it's more than what we're talking about here. The proofs of claim were larger than just the Jabil debt. That was the only one the trustee put in. That was the trustee's choice. As I understand it, this was the case of the vanishing action where all of these defendants were sued and they were dropping like flies and ended up with basically Ebert saying to the jury, all we've got left is Jabil or however you want to pronounce it. I have a question about that contract. Mr. DeGioia did not become a director until October 2011, yet the contract with Jabil was signed in May of 2011. As I understand it, I think I read that Mr. DeGioia sunk something like $11 million into this company. So how can he be held breach of fiduciary duty related to that Jabil contract when he wasn't even on the board when it was signed? Again, in my answers to Judge Haynes, I was trying to make clear that the damage element for Mr. DeGioia's breach of fiduciary duty was not specifically tied into the Jabil contract. That was a testimony by Mr. Mance. Where would we look for that? I'm sorry? Where would we look for this testimony that supports the point you just made? That the, yeah, there was the $2.2 million. That was, well, you can see that in the closing of the, if that's on page 10391 of the record, the closing was where the trustee asked the jury to award the damages against DeGioia based on the $2.2 million. In our brief, we have cited the specific point in the record, and I will find that for you, Your Honor, where he testified. You're getting some help behind you here. There you go. Sorry, it's on pages 47 and 48 of our brief. He just turned his trip to New Orleans. Sorry about that, Your Honor. To get to your question then, so the breach of fiduciary duty damages to DeGioia were not tied specifically to the Jabil debt, and so his specific number wasn't. But what were his tied to? It was a chart that Mr. Mance presented and that the jury specifically asked. It was the only thing they asked for in their deliberations to look at was the Mance report, and it was a chart showing all of the liabilities, how the debts and liabilities of a jury. How does that square up with the $11 million he put in? Obviously, it's not. It wouldn't be double-counted, Your Honor, because it was net liability, so if he put money in, he wasn't going to get charged for that. But he's not the only director. So, I mean, I'm sure he put in more than the other directors, so why aren't you getting credit for that? He didn't get double-charged for that, Your Honor. This was a scheme that the trustee proved or the jury could reasonably conclude was a scheme that was hatched that would Put $11 million into a sinking company that then sinks. And then he has to also pay $2 million more, and that's a little bit of a hard case to... Well, Your Honor, again, this is why we... He was this evil guy dumping money in a company that he never got anything out of, so he never got any pump, and the dump was the money he put in. I understand it, Your Honor, but, again, this is one of the reasons that we have juries do these things, and that is because... No, but the juries have to be properly instructed. Juries have to receive evidence. I mean, I'm... Look, I was a trial judge for eight years. I'm very respectful of juries. I was very impressed with the jurors I had in my court. I'm not trying to go undercut the jury system. I love the jury system. I really do. But it is premised upon proper legal instructions, proper proof, proper legal concepts, all of that. First, the instructions. The instructions were never objected to. All of the defendants that proposed the instructions didn't object to them on all of the issues that they're raising now. In terms of Mr. DeGioia, the jury heard the story that Your Honor is just positing, that he was an innocent victim of this, that he put in the money. No, I'm not suggesting he was an innocent victim. I'm just suggesting nobody denies he put a lot of money in. Right. The jury heard that defense, and they also heard all of the other evidence that he was facilitating and covering up the involvement of a convicted serial securities fraudster, that he was preventing the board from firing Cohen, that he funded all of the— They didn't find—if I'm remembering right, they didn't find Abel liable for the damage element one. They found DeGioia liable. Right. Because DeGioia was— But that's because he's supposed to be helping this convicted felon who didn't commit damage element one. Am I misremembering? Well, the question there, of course, DeGioia was the one who was the director. No. Damage element one, Apple was zero. Apple and Bartlett weren't directors. DeGioia was. Okay, but he was the felon that was supposedly being helped. Yes, and so what the— And yet on damage element two, they don't find anything for DeGioia. Right. So how does this even make sense? Well, because he didn't personally benefit is the question. And so obviously, Your Honor, this was a very complex factual case that was tried to a jury over five days in which they heard the witnesses, including Mr. DeGioia, tell them that he was an innocent victim, that he had no involvement, that he wasn't doing anything. They also saw all of the evidence that, for example, Mr. Waller at page 14714 is the CEO. He said he had been trying to circle the wagons on Mr. Appel since day one, but he had, quote, DeGioia had thwarted him on every single occasion. He said DeGioia invited Appel to board meetings and then lied about his participation. He refused to acknowledge board meetings, mentioning wrongdoing of the Appel group. He forced the company to rescind the firing of Cohen. He said, I was appalled, but JP, that's DeGioia, was paying the bills and refused to acknowledge the clear wrongdoing of all these people. So I think what the jury legitimately was entitled to conclude was that this was a scheme that was hatched, and frankly, Your Honor, the fact that he plowed the money in when he was supposedly a sophisticated investor and yet there was no business plan, there was no even understanding of what their costs were, there was no reasonable likelihood that this technology would ever succeed, and the jury could conclude... So what was your, sum up in a sentence or two, the nefarious purpose here in the $11 million and all that? What was he going to gain? He got stock for that $11 million, Your Honor, and if that stock had gone up, he got about 11 million shares. If the stock had gone up, it would be because the company was succeeding, and that would sort of undercut this argument. Well, the plan was that the stock would go up because people perceived the company as succeeding. That's the plan. And he obviously didn't succeed, and he probably put in more money than he wanted to, but in this case, if the stock had gone up a dollar, he would have made back his entire $11 million. And so this was something that the jury... This was a key issue, and the question was, is this a legitimate company that just went under, or was it a company that was essentially hijacked by this group for illegitimate means? Let me ask you the same question I asked Mr. Shemin, and I also want to ask Mr. Farrell, because I didn't do it during his initial argument, about the punitive damages. If we were to do something other than fully affirm or fully reverse, other than the caps being implicated under Texas law, which weren't implicated here because of the numbers, but they might be if the numbers change, other than that, is there any other aspect about the punitive damages that changes? Anything that requires us to remand? I don't think so, Your Honor. Obviously it's hypothetical, but I don't think so. I'd like to actually, if I could just turn briefly back to that, just to tie up the standing question, because I actually think this is a key distinction here, and the question is who has the claim? Whose claim is it? And this is a claim. This is the company's claim. The question is not where the money is ultimately, where it's going to go after the bankruptcy distributes it. That doesn't tell you who has the claim. And in this case, the only party, the only party that could bring these claims was the trustee. And I would also add just briefly, if I could make some responses to the argument that was made on the Kinsback issue, these courts were not making eerie guesses. They were simply applying Kinsback, which was the law. You have a waiver. Do you agree with his read of Parker that it forbids using Kinsback for damaged cases or that it simply requires causation for damaged cases? No, Your Honor. I don't agree with his distinction of Parker, but I would also add that argument was never made below. And Parker was out before the trial. And Parker was out before the trial in this case. So I don't. There is a proximate cause requirement as to the initial actor. Right. And that's my read of Parker is that it's saying that Kinsback without causation is equitable relief. But I am not understanding Parker to say you can never bring a Kinsback claim for damages if you do prove causation. I agree with that, Your Honor. Okay. And causation doesn't. That's why I found that argument a bit scurrying. I guess that is the essence of what they said in their brief, but I'm still startled by it. Proximate cause was, in fact, part of the jury instruction here, and the jury found proximate cause. Right. They never asked for any more than that. That's all they asked for. Okay. What about the theoretical issue, if you will, of when can a Fifth Circuit case that comes out after a trial, interpreting Texas law, be a, quote, change in law necessary to sort of alter the trajectory of invited error waiver and those kinds of things? The only theoretical way I could see that happening would be if the Fifth Circuit said, we have a prior case in which we predicted Fifth Circuit law in one way, and now we're saying, oh, that's just wrong. But the Fifth Circuit doesn't change Texas law. You're saying if the Fifth Circuit had gone on bonk or something, it changed its own law. Its own law, yes. Its own case. But the Fifth Circuit saying in a case about negligence and strict liability that there is no aiding and abetting can't change the law of Texas about knowing participation in fraud. No. And, in fact, DuPuy was just following Parker, which Parker – And there's no – I mean, I didn't miss something in DuPuy or however you pronounce it. It wasn't a fraud case or a producer duty case. No, in fact – It was a strict liability case or products liability case. It was. And all they said was we're not going to create a cause of action for that, but they – But they cited Kinsbach. We think it supports us because they cite Kinsbach. In fact, they emphasize breach of fiduciary duty in the opinion. It's actually emphasized by the court and said that's a different case. Right. It's our case. So, I mean, to sum up, Your Honors, very few of the issues that have been raised by the defendants in their brief were ever preserved or timely preserved below. They are not entitled to retry the case on factual issues that were the subject of what the jury was properly instructed. They have made no challenges to any of the jury instructions in this case. They've not asked for a new trial. They are essentially trying to retry their case and to do it on issues that they never gave the trial court the opportunity to even pass on. And that's not the function of the appellate review. This is a court of review, not a court of first view. And I think that the trial judge would be surprised to find a lot of these issues that we're arguing about today because he never was given the opportunity. I remember that feeling. I'm curious as to your saying they're not asking for a new trial. I just grabbed one of the briefs. It says alternatively the final judgment should be reversed and remanded for a new trial. I misspoke, Your Honor. I apologize. I misspoke. I did not think that they were asking for a new trial, but you are correct. I'm sorry about that, Your Honor, but they did not object to the jury instructions. I was wrong on that, Your Honor, and I apologize. They did not object to the jury instructions and, in fact, invited most of the alleged errors that they now claim. And we, again, cited all the testimony in our brief. The judge, it was a complex case. It was tried fairly and the jury was instructed fairly and reached a fair result that is not subject to review on appeal. Well, let me just clarify, in fairness to you, DeGioia asked for a new trial. The other blue brief doesn't ask for a new trial. It asks to reverse and render, as DeGioia also does. And I don't like to misspeak, and I did misspeak, and I apologize, Your Honor. So in sum, we would ask that the court affirm the judgment below. Thank you. Judge Haynes, I want to be as clear as I can on my Parker-Kinsback argument. If we get over the Dupuy issue, and I agree with exactly what you said, which is that Parker, what Parker says is if there is such a cause of action, whether we call it knowing participation or aiding and abetting, there has to be a proximate cause. Okay, so it didn't overrule Kinsback as to damages. It just added this causation, which is in the jury instruction. Right, but my point is as to the $6.5 million that was found against Cohen in damage element number one, there is no finding that DeGioia proximately caused any portion of the $6.5, which there would have to be because you can't, even if you have a finding of concert of action or aiding and abetting, you can't automatically assume under Parker that DeGioia's aiding and abetting or knowing participation proximately caused that $6.5. In fact, all you know from the jury charge is that it proximately caused the $1.5. Now, would you like to address the punitive damages question? Do you have a different take on it than the other two? I think I do have a slightly different take on it. Even if you were to carve up the case and leave some actual damage piece still out there, I still think there's a separate issue on punitive damages, and that is under Texas law and under the charge the jury had to find the predicate for punitive damages by clearing convincing evidence, and so I think there's a separate legal sufficiency, a separate evidentiary challenge that would still survive. I'm just wondering why nobody's arguing that it impacts the nature of the wrong and the character of the conduct involved if we get rid of some of that, which is what you look at in punitive damages. I mean, whatever. It's fine. We'll deal with it if we get there. We may not, but I wanted to ask that because there's so many pieces flying around. I wanted to at least let you all argue it. Nobody seems to see Texas punitive damages quite the way I do. The point I'm trying to make is I do think that there would be a separate evidentiary analysis and review for this court. With respect to standing. Right, but what is the effect of that? Do we have to send it back if the dollars change other than just for the Chapter 41 cap, which the district court can do, but is there anything the jury has to do? Does it alter that? I would argue that you could render in my favor on punitive damages because there's no evidence. That's a zero. That's a zero. I would think that if you were not going to buy that argument and you're otherwise reducing the damages, that perhaps you would have to remand for a reassessment of the punitive damages because there would be, as you say, a whole new set of relevant circumstances. If I could address standing very briefly. This is not a Norris case. In Norris, the party who brought the claim was the original party to the contract who had injury in fact, had Article III standing. Now, when that party went bankrupt, arguably the bankruptcy trustee then acquired the right to bring that claim, but that was a real party of interest question because it was a question of had the right to bring that claim, in essence, been assigned to the trustee. But the party who brought the case had Article III standing. Here, LSI, we submit, did not have Article III standing with respect to the JVIL claim because as they argued the case to the jury, the debtor before bankruptcy and therefore the trustee after bankruptcy had no injury in fact. What's your response to the $1.5 million not being JVIL dollars? There is a spreadsheet in evidence from Mr. Mance, the expert, and all he did was take the existing liabilities on the books and records of LSI on the day DeGiuria became a director and said that was $2.2 million. The rest of the story, though, is because Judge Haynes, as you noted, DeGiuria put all this money in, over the tenure of his service on the board, that $2.2 million in fact went substantially down because he was putting money into the company to help. Did it go down to 1.5? It went down, I think, below 1.5. And even if you look at the 2.2 number, that's essentially the same problem as the JVIL problem because all that was was a compilation of the debts that existed on the books at the time. In other words, the creditor claims that creditors could have asserted not injury to LSI. Now I could see that there could have theoretically been an argument and evidence that entering into the JVIL contract caused harm to LSI as opposed to JVIL. You could imagine such a claim. But here there was no evidence of it. The only evidence was JVIL sold equipment and got stuck for the 9.5. For example, had there been evidence that if that 9.5 didn't exist as a debt, then LSI could have entered into some other profitable contract and made money somehow, but they couldn't because of the JVIL debt. Then you could piece together a theory there, but the damages there wouldn't be measured. I think I'm following you. And as I was saying to one of your friends on the other side, it does seem to me there is injury here because of alleged violations of fiduciary duties. But I'm just not sure about the quantifying of it and the relying on it. And I'm not sure. I think you may be right that the 2.2 is maybe not a better argument than the JVIL contract, but the jury was given instructions that were not objected to beyond that had been preserved today. We'll just have to wrestle with that. I just have one quick question. Yes, Your Honor. Assume there is no standing on damage element number one. If there is no standing for damage element number one, can there still be standing for damage element number two? I think that theoretically can. I think the standing inquiry has to be made on a claim-by-claim basis. But on damage element number two, of course, there was a finding of zero as to de jure by the jury. Right. All right, counsel. Thank you. Thank you. May I please? The court, you heard the argument from the appellee. We're still talking about some type of fraudulent scheme. All fraud claims were dismissed with prejudice in this case before it went to the jury. The only issue was the pump-and-dump scheme. The trial court, in denying the motions for the post-trial motions, the Rule 50 motions, stated that the breach of fiduciary duty was that Matt Cohn caused LSI to enter into a multimillion-dollar contract with Jabil for an illegitimate purpose. The only illegitimate purpose was that pump-and-dump scheme. There's absolutely nothing in the record, nothing in the record. It keeps getting perpetuated. It went from pump-and-dump to attempted pump-and-dump to no evidence proffered by the plaintiff during the entire course of the trial. Mr. Mann's testifying that he was capable, but he did not analyze the pump-and-dump scheme. And finally, in closing, let me just say that these alleged nominee companies, for which there's no proof of Howard Pell,  That's in the record. It was in closing argument as well. $14 million, and that's no disrespect to Mr. DeGioia. Thank you. All right. Well, this is a complex case. You've all done able jobs here. It's now up to us to see what we can do with this. That is the end of the arguments for this week. We are adjourned.